**RED RIVER LUMBER CO. v. CARDENAS.**

**No. 8452.**

Circuit Court of Appeals, Ninth Circuit.

March 3, 1938.

Hardin Barry, of Susanville, Cal., and A. G. Bailey, of Woodland, Cal., for appellant.

Olds & Olds, Thomas C. Ryan, and Walter K. Olds, all of San Francisco, Cal., for appellee.

Before DENMAN, HANEY, and HEALY, Circuit Judges.

HEALY, Circuit Judge.

This appeal is from a verdict and judgment in favor of appellee awarding damages for a personal injury.

The complaint alleges that one David Bohannon was employed by the appellant lumber company (referred to in this opinion as the company) to patrol the streets of the town of Westwood and to investigate thefts from stores owned by the appellant or operated by tenants of the latter. During the night of May 13, 1934, while Bohannon was patrolling the streets in the course of his employment, he undertook, it is alleged, to apprehend and question appellee on suspicion that the latter had stolen merchandise from an establishment operated by the company. Appellee attempted to run away, whereupon Bohannon pursued and wrongfully shot him with a tear gas gun, inflicting the injury complained of. The answer denied that Bohannon was patrolling the streets of the town in the course of any employment with the company, and averred that he was doing so in line with his duties as a deputy constable of Westwood township; that as such deputy constable he undertook to place appellee under arrest; and that the battery was committed by Bohannon in the course of the performance of his official duties as such police officer.

The sole question involved here is whether the deputy constable, at the time he committed the battery complained of, was acting within the course and scope of his employment for the appellant. The facts are not substantially in dispute, and may be summarized as follows:

The lumber plant of appellant is situated in the town of Westwood in Westwood township, the latter covering an area sixty miles long by twenty miles wide. At the time of the occurrence there were approximately nine hundred dwelling houses in the town of Westwood, all of which were owned by the lumber company except those in the residence districts described as Old Town and Robbers' Creek, where the houses were owned by private individuals. The dwellings owned by the lumber company were leased to people who lived in the town, most of whom were employees but a substantial part of whom were not in company employ. The company operated a drug store, hardware store, carpenter shop, and theater, but all other business establishments in Westwood were privately operated in buildings under lease from the com-

pany. In Westwood proper all the real estate was owned by the company except the streets and sidewalks. The town of Westwood is not incorporated and has no organized government. It covers an area somewhere in the neighborhood of ten square blocks.

The lumber manufacturing plant of appellant comprises about six hundred acres. It is one and one-half miles long and two-thirds of a mile wide, and is enclosed by a fence which sets it off from the town. At the time in question the company employed approximately eighteen watchmen in its yard, six men on a shift, these men being continuously on duty in the nighttime and being required to make the rounds of the plant every hour. The maintenance of this surveillance was said to be made necessary by the terms of the policy of insurance carried on the lumber plant. In connection with its watchman service the company had an electrical system of reporting boxes to record at a central place the punches of the watchmen as they made their rounds. One Small was superintendent over all these watchmen, being paid by the company a regular salary of $35 per week. Small was also constable of Westwood township.

In August, 1933, Bohannon was hired as an ordinary watchman in the lumber plant, his employment being effected by Small without previous consultation with the company. In November following he was made a foreman of watchmen on one of the shifts, and at the same time was appointed by Small as deputy constable of the township. Small instructed him to patrol the town of Westwood, to answer phone calls, and to investigate any disturbance of the peace of other public offense occurring during his shift. His hours were from 1 to 7 o'clock a. m. His instructions from the lumber company had to do with the supervision of the watchmen in the company's plant. These instructions were to keep close check on the yard watchmen, to look after them in case they called him or needed help. When a watchman did not punch in as required, the telephone operator for the company would blow two blasts of the whistle, which was the signal for Bohannon to report at once to the plant to see what was wrong. He was furnished by the company with an automobile in which he usually made the rounds of the town. There is uncontradicted evidence that it was necessary for him to answer summons to the plant without delay when watchmen in the yard failed to report in, the insurance requirement being that irregularities must be investigated and reported upon within not to exceed fifteen minutes. Bohannon was paid $25 per week by the company, but received no compensation from the county for his services as constable, except mileage in criminal investigations. There was no direct evidence that the company gave any instructions to Bohannon in respect of policing the town, or that the company exercised any supervision or control over his activities in that respect. There is direct evidence to the contrary.

Outside of the times during the night when he was required to report at the plant, or was called there in response to his signal, Bohannon spent the hours of his shift patrolling the town. About 1 o'clock on the night of the incident in question, he reported for duty at the telephone office of the company and signed the latter's time sheet. He then went to the dispatcher's office of the company and punched his time card. About 1:30 he got a call from the company's telephone operator saying that there was a drunk around the rooming houses, or by the Westwood Club, disturbing the peace. There were many rooming houses in the neighborhood of the Westwood Club (which was a privately operated establishment), and the operator did not say who had phoned in complaining of the disturbance or from whence the call had come. Bohannon went up the street past the Westwood Club but did not find any drunk. In cruising about the town he says he noticed the appellee and some other parties talking near a rooming house. Not seeing anything out of the way, he drove on and continued his patrol of the streets. About 2 o'clock he saw appellee walking down a street with some boxes of candy, a carton of cigarettes, and a carton of tobacco under his arm. Bohannon drove to the curb and made inquiry of appellee as to what the latter was carrying and where he had gotten it. Not receiving a satisfactory explanation, other than that appellee had bought the merchandise at the Westwood Club—which was closed at that time of the night—Bohannon ordered appellee to get into the car, saying that he intended to take appellee to the fire hall and ask him a few questions. The fire hall belonged to the company and was in charge of an employee named Shaw, as fire chief. Shaw made his home in the fire house. After reaching the steps of the fire hall, the appellee turned and ran up an alley, being pursued by Bohannon. The

battery occurred in the course of this pursuit.

It appears that appellee had broken out of, if he had not broken into, the Westwood Club, a pool hall and card room operated, as had been said, by parties other than the company. He had admittedly taken from that place the merchandise which he was carrying when apprehended. Subsequent to his arrest and injury he was taken by Bohannon to the jail, which belonged to the county. From there he was removed to a hospital. Small employed a man to keep guard over him while in the hospital. This guard was paid upon a regular claim presented to Lassen County. Bohannon made some investigation of the premises of the Westwood Club immediately after the arrest. Next morning Shaw and one Freemyers, another employee of the company, who was also a deputy sheriff of the county, investigated with the view of determining whether the Westwood Club had been burglarized. Freemyers testified that he made a report of the result of his investigation to an official of the company. There is no showing that Shaw, the fire chief, had any inquisitorial authority from the company, or any duty or responsibility aside from his work as fire chief. Bohannon testified, without contradiction, that he took appellee to the fire house because Shaw was well acquainted with the inhabitants of the community and might be able to identify appellee. On complaint of the proprietor of the Westwood Club, the appellee was charged with the crime of burglary. He was taken before the justice of the peace at Westwood for preliminary examination, and the district attorney of Lassen county conducted the case on behalf of the People. The hearing resulted in appellee's discharge.

It would serve no useful purpose to review the many cases involving the liability of persons or corporations for the wrongful acts of employees who have been commissioned as police officers, and who thus function in a dual capacity. These cases are collected in an annotation in 55 A.L.R. at page 1197. They disclose a substantial lack of harmony.

Appellee contends that the proof warranted the belief on the part of the jury that the company had virtually taken over the task of preserving law and order in the town. We are unable to agree with this. At the time of the incident there was a justice of the peace at Westwood whose jurisdiction extended over the township. This officer had been regularly elected and he was not at the time in the company's employ. Small was the duly elected constable of the township, and in this capacity the county paid him a salary of $100 per month. The record before us does not indicate that the company requested Bohannon's appointment as a deputy constable. The authority of Small to appoint a deputy and to direct him in the performance of his duties was derived from the statutes of the state. Political Code §§ 4187, 4024. These circumstances, together with the conduct of the criminal proceeding following the arrest, indicate that the public authorities were functioning in the community in the normal manner. In view of the nature of his duties to his employer, we regard as of little significance the fact that the company paid Bohannon's wages covering the time spent in patrolling the streets.

There is no evidence that the arrest was made at the instigation of the appellant, or that the battery was committed otherwise than in the attempted performance by Bohannon of his duties to the state. Whether there were reasonable grounds for the belief that appellee had committed a crime, or whether the arrest was accomplished with undue force, are questions resolved adversely to the appellant by the verdict of the jury. But it is plain that Bohannon believed, on grounds however inadequate, that appellee had committed a public offense. The deputy constable was not shown to have acted under the belief that the offense was one against the company. On the contrary, the record intimates, if it does not conclusively show, that the arrest was actuated by the suspicion on Bohannon's part that a theft or burglary had been perpetrated involving the property of some one other than the company. Nor was the arrest made or the battery committed on the company's premises. Both occurred on a public street of the town. Pennsylvania R. Co. v. Kelly, 2 Cir., 177 F. 189, 30 L.R.A. N.S., 481. A different situation would be presented had the incident occurred in the performance by Bohannon of his duties for the company in or about the latter's plant, or in the immediate protection of its property.

The California rule is to the effect that the acts of a special policeman are presumed to have been done in his capacity as a public officer. Maggi v. Pompa, 105 Cal.App. 496, 287 P. 982. While we

do not find that the authorities are at all unanimous in the recognition of such presumption, the burden is quite generally imposed on the injured party to come forward with some proof giving rise to an inference that the tort of the officer was committed in the course of the performance of his duties to his private employer, rather than in his official capacity. In the case before us there is no substantial evidence warranting the inference that the tort was committed by the officer otherwise than in the performance of his official functions.

The judgment is reversed.